[No. 1148.]

THE STATE OF NEVADA EX REL. W. E. COPELAND, RELATOR, v. J. P. WOODBURY ET AL., RESPONDENTS.

BOARD OF COUNTY COMMISSIONERS MAY BE INCREASED OR DECREASED—CONSTITUTION CONSTRUED.—Section 26, art. IV., of the constitution, making it the duty of the legislature to "provide by law for the election of a board of county commissioners," does not prevent the legislature, after the board has been once created, from increasing or decreasing the number of commissioners that shall constitute the board.

IDEM—STATUTE 1869, 92, CONSTRUED—LAST GENERAL ELECTION.—*Held*, that the words "last general election," as used in the statute, "creating a board of county commissioners in the several counties of this state" (Stat. 1869, 92), mean the last general election preceding the time when the commissioners

are required by law to assume the duties of their office. (Leonard, J., dissenting.)

Idem—Intention of Legislature—Number of Commissioners.—It was the intention of the legislature to classify the counties by a voting population at the general election, and to give to each county polling four thousand or more votes five commissioners, and all other counties three, for a period of two years, commencing on the first Monday in January after the general election.

Rehearing—When Should Not be Granted:—A rehearing should not be granted for the purpose of having a reargument, unless there is a reasonable probability that the court may have arrived at an erroneous conclusion or overlooked some important question which was necessary to be discussed, in order to arrive at a full and proper understanding of the case.

Application for writ of *quo warranto*.

The facts are stated in the opinion.

*R. B. Mitchell* and *W. E. F. Deal*, for Relator:

I. The object of the act was to regulate, in certain counties, the number of county commissioners by the number of votes polled at the election at which such commissioners are voted for.

II. The registration determines the maximum of votes that can be polled. It does not follow that because four thousand votes or over are registered that a less number may not be polled; but where the registration is less than four thousand, no more can be polled, so that both candidates and officers whose duty is to call elections know before the election where the registration is less than four thousand that no more than the number registered can be polled.

III. The intention of the legislature in passing the act of 1869 was to keep down the burdens of government by limiting the number of officials to the ratio of the sustaining population, and to fix a certain test which was the number of votes cast at a general election held at recurring periods.

*B. C. Whitman* and *F. M. Huffaker*, for Respondents:

I. The board of county commissioners is to be kept full by elections, and it is with reference to calling such elections that the words "last general" are used. The number of votes polled at the last is the basis of the case for the next election.

To make that call, recourse must be had to the "last general election" theretofore and the number of votes cast thereat. To adopt any other rule is to admit the apparent absurdity that the board of commissioners depends not upon its election upon legal call, but upon the number of votes polled at the election at which it is presumed to be filled, and that may or may not be as the count reaches, or fails to reach, the requisite numerical strength.

II. The legislature carefully provided for an increase of the number of commissioners if the votes polled at the election therefor exceeded the minimum, and reached the maximum, of the statute, but there is no provision for any decrease. *Ex-industria*, this has been avoided, and the omission is evidently intentional.

III. The fact is that a board of five, once inaugurated, the number was to be permanent, for it would be nearly impracticable to reconcile the theory of the construction of a board of five, with the possibility of lessening that number by the results of an election not called in that view. Unless all three commissioners were elected in Storey county at the last election, none were; and, further, the two remaining commissioners of the old board, being in office under the theory of a board of five, are illegally there. Either there is a board of five in Storey county or there is no board, and the governor must appoint.

IV. The boards, of either three or five commissioners, being once constituted, could not thereafter be abolished, except by constitutional amendment. (Const., sec. 26, art. IV.) The office being designated by the constitution, the only legislative duty was to fix the number which was to constitute "the board." This once fixed, the legislature became *functus officio*, and the office could not be abolished without a constitutional change. (*State* v. *Tilford*, 1 Nev. 240.) The legislature did utterly and entirely fail to provide for any diminution of the number of the board of county commissioners under circumstances such as underlie the case at bar, and, it would seem, could not constitutionally do so under any circumstances, so it follows that, as the court cannot make or alter the law, but must decide it as written under the constitution, the

respondents must hold their offices, no matter what suggestions be made on the part of the state as to the policy or impolicy, wisdom or folly, of the statute.

By the Court, HAWLEY, C. J.:

This is a proceeding by *quo warranto* to determine whether the respondents are entitled to hold the office of county commissioner of Storey county.

The petition avers that at the general election held on the second day of November, 1880, there were elected in Storey county three county commissioners; one commissioner to serve for the short term of two years, and two commissioners to serve for the long term of four years, from and after the first Monday of January, 1881.

That at said election there were polled over four thousand votes—viz.: five thousand two hundred and forty-seven votes.

That at the general election held on the seventh day of November, 1882, in pursuance of a proclamation made by the board of county commissioners, there were elected three county commissioners in Storey county—viz.: J. S. Werrin and J. P. Woodbury for the long term of four years, and John Vandewater for the short term of two years, from and after the first Monday of January, 1883.

That the total number of votes cast at said election was less than four thousand votes—viz.: two thousand nine hundred and thirty votes; that of that number Werrin received one thousand seven hundred and ten votes, Woodbury received one thousand six hundred and three votes, and Vandewater received one thousand six hundred and seven votes.

That at every general election held in Storey county, from and including the general election held on the third day of November, 1868, up to and including the general election held on the second day of November, 1880, there have been polled by the qualified electors of said county over four thousand votes.

Upon these facts the right of respondents to hold the office of county commissioner must, in our opinion, be determined by a construction of the act "creating a board of county com-

missioners in the several counties of this state." (Stat. 1865, 257; Stat. 1869, 92; 2 Comp. L. 3070.)

As amended in 1869 this statute reads as follows: "Section 1. At the general election of the several counties in this state in A. D. 1870, by the qualified electors of each county, a board of county commissioners, to consist of three members, shall be elected, to possess such qualifications, and to have such powers, as hereinafter provided; *provided,* that in any county where, at the last general election, there were polled four thousand or more votes, such board shall consist of five members. At the general election in A. D. 1870, and at such election held every two years thereafter, there shall be elected in such county one commissioner to serve upon the board of county commissioners for the term of four years; and a term of four years shall be known, both in this act and for the purpose of the election of county commissioners, as the long term; and the other commissioner or commissioners, as the case may be, necessary to fill the board, shall, at said election, be elected to serve upon the board for the term of two years; *provided,* that in any county or counties which are, or shall be, under the provisions of this act entitled to a board consisting of five county commissioners, two of the commissioners shall be elected to serve upon the board for the long term. In any county wherein at the last, or any future general election there were, or shall be, polled for the first time, four thousand or more votes, the board shall be increased to five members by appointment of the governor; and such appointees shall hold their offices until the first Monday of January following the then next general election; and at such next general election in such county or counties five county commissioners shall be elected, as provided in this section of this act."

The constitution of this state makes it the duty of the legislature to "provide by law for the election of a board of county commissioners in each county" (sec. 26, art. IV.), and, upon this provision, it is argued by respondents' counsel that after the board had once been created by the legislature so as to consist of five members, it could not thereafter be changed except by constitutional amendment. This view, if sustained, would give to Storey county five commissioners, although its popula-

tion might decrease to one thousand, or one hundred, or less votes. This argument cannot be sustained. The constitution does not, in our opinion, impose any such limitation of power upon the legislature. Having made provision for a board of county commissioners in the several counties, the legislature, has the power to classify the counties according to the population, and provide the number that shall constitute the board, by the number of votes that may be cast at the election. Such classification may at any time be changed and the number of commissioners increased or decreased, as the legislature, in its wisdom, may see fit to direct.

It is claimed by respondents that the words "last general election," as used in the statute, are to be construed as a basis of the call to be made for the next general election, and that Story county, having in 1880 polled more than four thousand votes, it was the duty of the county commissioners, in 1882, to issue a proclamation for the election of three county commissioners, viz: one for the short and two for the long term; and that respondents having been elected in pursuance of such a proclamation, and having received their certificates, were, and are, entitled to hold their offices.

If there was no office, under the statute, to be filled, then the proclamation of the commissioners would be without authority of law, and the respondents cannot claim any right to the office from the mere fact that the forms of law for the election had been complied with. There must be an office to fill, and their right must be and is dependent upon the question whether or not, under the provisions of the statute, the board of county commissioners in Storey county is to consist of three or five members.

If respondents' intrepretation of the statute is correct, then Storey county will be entitled to five county commissioners for the next two years, although it did not at the last general election cast four thousand votes. And it would be the duty of the present board of county commissioners, prior to the general election in 1884, to accept, as a basis for the election of their successors, the vote cast in 1882, so as to reduce the number of the board to three members, because there was not at such election four thousand votes cast; and this would be

their duty, although it might, at that time, be apparent that there would be more than four thousand votes cast at the general election in 1884, and the county for two years thereafter would only be entitled to three commissioners, although its voting population might at the last general election have been more than four thousand.

Is this interpretation of the statute correct?

If this interpretation is within the letter of the statute, and is supported by a strict grammatical construction, as is claimed by respondents, is it within the spirit of the act?

What was the intention of the legislature?

Where a statute is clear, plain and unambiguous, we have repeatedly declared that there is no room for construction and the law must be followed regardless of results. But in all other cases where there is any doubt as to the meaning of the words employed in a statute, it is the duty of courts to consider the object, scope and extent of the act in order to arrive at the intent which the legislature had in view in passing it. The intention of the legislature must, in such cases, control the courts. (*Thorpe* v. *Schooling*, 7 Nev. 17; *Odd Fellows' Bank* v. *Quillen*, 11 Nev. 114; *State* v. *California Mining Co.*, 13 Nev. 224; *Ex parte Siebenhauer*, 14 Nev. 368; *State ex rel. Flanningham* v. *Board of County Commissioners*, 16 Nev. 94.)

In order to get at the intention of the legislature, courts have never hesitated to sacrifice the letter of the statute to the purpose and object of the legislature, whenever it could be done without violence to the language of the statute.

In *ex parte Siebenhauer*, *supra*, we said: "In order to reach the intention of the legislature, courts are not bound to always take the words of a statute—either in their literal or ordinary sense—if by so doing it would lead to any absurdity or manifest injustice, but may, in such cases, modify, restrict or extend the meaning of the words so as to meet the plain, evident policy and purview of the act and bring it within the intention which the legislature had in view at the time it was enacted."

Numerous authorities are cited in support of this doctrine. (See, also, *State* v. *King*, 44 Mo. 285; *People* v. *Utica Insu-*

rance Co., 15 Johns. 358; 8 Am. Dec. 251; *Smith* v. *People*, 47 N. Y. 337.)

We do not think there is any difficulty in ascertaining the intention of the legislature.

When the entire section of the act is read and carefully considered, it is evident—to our minds—that it was the intention of the legislature to give to every county in the state, at every general election wherein less than four thousand votes are cast, a board of three county commissioners, and to every county in the state wherein, at the general election, more than four thousand votes are cast, a board of five county commissioners, thus making the enforcement of the statute uniform throughout the state in pursuance of the provisions of the constitution, that "the legislature shall establish a system of county and township government, which shall be uniform throughout the state." (Art. IV., section 25.)

The words "last general election" must be construed to mean, and do mean, the last general election preceding the time when the commissioners are required by law to assume the duties of their office. (Flanningham's case, 16 Nev. 92.)

The statute does not establish any basis upon which a call for the election of county commissioners can always be definitely made in counties entitled, under its provisions, to five commissioners, and there may arise some inconvenience in determining in advance whether the county is entitled to three or five commissioners. It is in many respects crude and imperfect. The draftsman in preparing it did not stop to consider whether any county in this state, having once cast four thousand votes, would ever decrease in population to less than four thousand votes. He was, to quote the language of the court in *Lane* v. *Schomp*, 20 N. J. Eq., 85, "a bad grammarian, or lacked clearness of conception sufficient to enable him to carry out the idea with which he began a sentence until he got to the end of it." But it is apparent that, with all its deficiencies as to the method of carrying it into effect, the real object of the section is absolutely clear and unmistakable, and hence, notwithstanding the inconvenience or uncertainty that may arise in determining before the election the number of votes that may be cast, it is our duty to carry out the spirit

of the act and give force and effect to the intention of the legislature. (*O'Neale* v. *McClinton*, 5 Nev. 336.)

As the respondents' right to hold the offices to which they were elected is, by the provisions of the statute, made to depend upon the number of votes cast at the time of their election, and less than four thousand votes having been cast, it follows that they are not lawfully entitled to the offices, and a judgment of ouster must be entered against them, with costs.

It is so ordered.

LEONARD, J., dissenting:

I am unable to agree with the construction placed upon the statute in question by the court, and consequently arrive at a different conclusion.

I think, with the court, that under the constitution the legislature has power to classify the counties according to their population, and provide the number that shall constitute the board by the number of votes polled. It might have adopted any other fair mode of classification. It had power to adopt the number of votes polled at the last general election prior to the term of office of the commissioners to be elected, if such a test is practicable. It had power, also, to adopt the number of votes polled at the general election two years prior to the one just mentioned. It might have adopted the number of voters registered at the last general election prior to the term of office of the commissioners to be elected. It could have limited the counties entitled to five commissioners to those having, at the times stated, either more or less than four thousand registered voters, or polling more or less than that number of votes.

The question here is, however, what test did the legislature of 1869 adopt ?

The legislative, not the judicial department, must make the test.

I agree, also, in the conclusion that the legislature intended to give five commissioners to counties polling four thousand or more votes, but I do not think it was intended to adopt as the basis of the number to be elected, the number of votes polled

at the last general election previous to the term of office of the commissioners to be elected; that is to say, I do not think the legislative intent was to give Storey county but three commissioners during the years 1883 and 1884, simply because less than four thousand votes were polled therein at the general election of 1882, it being true that at the general election in 1880, and prior thereto, more than that number were polled. The legislature desired to give five commissioners to the most populous counties, and the dividing line was drawn between those polling four thousand or more votes and those polling less.    They knew, or ought to have known, that the voting population of any county was liable to increase or decrease, not only during the two years between general elections, but also between the day of any general election and the time when the commissioners elected would assume the duties of their offices.    There is ample time in two months, as well as in two years and two months, to diminish the number of voters entitling a county to five commissioners to one entitled to but three.

But with knowledge of these facts, no provision was made for reducing the number from five to three, if, between the general election and the first Monday of January following, or thereafter, the number of voters should decrease from more than four thousand to three, two or one thousand.    Provision was made, however, for increasing the number from three to five, by appointment of the governor, after any general election at which four thousand or more should be polled for the first time.    If Storey county had cast four thousand votes at the general election in 1882, for the first time, it would have been entitled to five commissioners, but it could have elected three only; the other two must have been added by appointment.    The legislature intended to adopt a general system which, when put in practical operation, would come nearest giving five county commissioners to counties having four thousand or more voters, and to the others three.    To accomplish their object the statute in question was passed.    They took the votes *polled* at some general election as the test—not the number of voters that any county might in fact have, either before or after that election.    They ought to have selected the

election nearest, but before, the one of which the acting commissioners were required to notify the people as to the number of commissioners to be elected, and before voters were required to cast their ballots. They ought not to have required commissioners, in the performance of an official duty, to act in the dark, or the people to cast their votes for an officer when there is no office to fill.

It is true, as the court says, that respondents ought not to hold their offices if, at the election of 1882, there were no offices, under the statute, to be filled. But this fact does not assist us in our endeavor to ascertain the intention of the legislature when the statute in question was passed, nor should it keep us from considering the facts stated, and those that follow, in attempting to arrive at a proper conclusion upon the question in hand.

The legislature knew that, by the law then and now in force, it was the official duty of the acting board of county commissioners, at least twenty days before any general election, to cause its clerk to give notice in each election precinct of the offices to be filled. They knew that, subsequent to the time the several notices were to be posted, and the closing of the registry books, names might be struck from the registry; that voters might go out of the state before election, not to return; that the votes actually polled might, and probably would, be less than the number represented by the registry, and consequently that the commissioners might be misled themselves, and by their acts, honestly intended, deceive the people, and produce confusion and uncertainty, if nothing worse. Many counties in the state cover a vast area, and contain many polling places at great distances from the county seat. A large fraction of our people are, and in 1869 were, disposed to migrate upon slight change of conditions. In all the counties the only means of ascertaining the number of voters prior to giving notice was by an examination of the registry books, and in many the polling places and registry books are long distances away, and the means of communication are inefficient. The law does not make it the duty of the commissioners to ascertain the number of registered voters, or make provision for the necessary expense attending the same.

It is not the duty of the registry agents to inform the commissioners. But, suppose the aggregate registered vote in any county prior to a general election is four thousand and one votes. Every person registered *may* vote on election day, and if so, according to the theory of the relator, the county is entitled to elect five commissioners, and the commissioners must give notice upon the assumption that the county will be entitled to five; and yet, who does not know that it would be little less than a miracle if four thousand votes should be polled ?

I mention these facts, and suppose this extreme case, as some evidence showing that the legislature ought not to have adopted the election claimed by relator as the time when four thousand votes should be polled to entitle any county to five commissioners, and, consequently, that they did not intend to do so.

It is true that, in this case, the commissioners might have ascertained the fact that four thousand votes could not be cast in Storey county in 1882, because less than that number were registered. But this fact does not alter the case in our endeavor to find the legislative intent.

It is the duty of courts, in construing statutes, to regard facts and circumstances, like those stated above, existing at the time the laws were passed.

But what is the reasonable, natural construction of the statute under consideration, as it is written ?

It is not in all its parts as plain as it should be.

The first portion of the section admits of but one interpretation, and is as follows: "At the general election of the several counties in this state in A. D. 1870, * * * a board of county commissioners, to consist of three members, shall be elected * * *; *provided*, that in any county where, at the last general election, there were polled four thousand or more votes, such board shall consist of five members."

This part of the section is complete in itself, and deals solely with the election of commissioners at the next succeeding general election of 1870. If this provision related not only to the election of 1870, but to future elections also, there would be some room for argument as to the meaning of the words

"last general election." But now they can refer only to the election of 1868.

The legislature said, in substance, that at the next general election in 1870, a board of county commissioners, consisting of three members, should be elected in counties where, at the last general election, in 1868, there were polled less than four thousand votes; but in counties where, at the last general election, in 1868, there were polled four thousand or more votes, such board, to be so selected in 1870, should consist of five members. It seems to me there can be no escape from this construction, and the result is that for the general election of 1870, at least, in order that any county should be entitled to five commissioners, it was plainly provided that it must have polled four thousand or more votes at the previous general election in 1868. And is it probable that in a general law providing for the election of county commissioners for all future time, the legislature would intend to make one test as to the number to be elected for one year and another for a subsequent year?

The next portion of the statute treats of the number of long and short term commissioners to be elected in 1870 and every two years thereafter.

"At the general election in A. D. 1870, and at such election held every two years thereafter, there shall be elected in such county one commissioner to serve upon the board * * * for the term of four years, and the other commissioner, or commissioners, as the case may be, necessary to fill the board, shall, at said election, be elected * * * for the term of two years; *provided*, that in any county or counties *which are, or shall be*, under the provisions of this act, entitled to a board consisting of five county commissioners, two of the commissioners shall be elected to serve upon the board for the long term."

By this portion of the section, then, the legislature of 1869 provided that at the next general election in 1870, and at such election every two years thereafter, counties which then were, or which after 1870 should be, entitled to a board of five commissioners, should elect two long term commissioners. I have shown, to my satisfaction at least, that at the election of 1870

all counties which at the *previous* general election in 1868 polled four thousand or more votes, were entitled to five commissioners, and the part of the section just quoted made it the duty of such counties, in 1870, to elect two long term commissioners. The same duty was imposed upon any county which, subsequent to 1870, should be so entitled. If, at the election of 1870, the test whether a county should have one or two long term commissioners was that, at the previous general election in 1868, it polled four thousand or more votes, then, in as much as at any general election subsequent to 1870 any county was entitled to have two long term commissioners, and consequently to five in all, if it was in the same situation as to votes polled as was a county entitled to five in 1870, it seems to me to follow that, at the general election in 1882, a county which at the previous general election in 1880 polled four thousand votes, was entitled to two long term commissioners, and to five in all.

But to my mind, in construing the statute in question, the most important portion is the following:

"In any county wherein, at the last or any future general election, there were, or shall be, polled for the first time four thousand or more votes, the board shall be increased to five members by appointment of the governor, and such appointees shall hold their offices until the first Monday in January following the next general election; and at such next general election * * * five county commissioners shall be elected, as provided in this section of this act."

Unless the legislature used language to deceive and mislead, this means that any county which, at the election of 1868, polled four thousand or more votes, but elected only three commissioners, might have the number increased to five by appointment, the appointees to hold their offices until the first Monday in January following the general election in 1870; and any county wherein, at any future general election, there should be polled, for the first time, four thousand or more votes, should have an increase in the number composing the board by the same method.

Now, if the theory is correct that the test of the right to five commissioners is that, in this case, Storey county cast four

thousand votes in 1882, instead of 1880, why did not the legislature require the same test in cases where, "for the first time," four thousand were polled?

Take an example: Suppose at the last general election in 1882, Washoe county had polled four thousand votes for the first time. It is plain that it would have been entitled to five commissioners, and it is equally certain that its method of obtaining the additional two would have been by appointment. It was not intended that the two should be elected. And yet, Washoe county would have had the same means of ascertaining the number of votes that would be polled as Storey county had at the last election in 1882.

Why did the legislature provide for the appointment of two additional commissioners in counties only where, "for the first time," four thousand or more votes are polled? Because, before the vote is polled, the number of votes to be cast cannot be known. It may be, and probably is, true that the legislature did not stop to think that a county might, after polling four thousand votes, lose its population in part and subsequently cast less than that number, and then again poll the requisite number. But this fact does not tend to show that the legislative intent was to make the vote of 1882 the basis of the number of commissioners the county should now have, instead of the vote of 1880. The legislature certainly did not make provision, in terms, for such a case. Should it arise—as, for instance, should Storey county, in 1884, poll four thousand votes—the question would then be presented whether, under the existing law, it would be entitled to three or five commissioners.

Although that question is not now before the court, my present impression is, and as such only I give it, that the number of votes polled in 1882 should be taken as the basis for the number of commissioners to be elected in 1884, but that the words "for the first time" in the statute ought to be disregarded, and two additional ones appointed by the governor. This would, in my present opinion, be carrying out the letter and spirit of the law. I am satisfied with the decision in the Flanningham case. Considering the object and scope of the law there under consideration, together with the lan-

guage used, we were, and are, of the unanimous opinion that the words "last general election" were intended to mean the last general election preceding the time when the claim for his salary was made by the justice. I do not think they were intended to refer to that time in the statute now under discussion, but that they refer to the general election of 1868. For the reasons stated, I respectfully dissent from the opinion of the court that a judgment of ouster should be entered.

### RESPONSE TO PETITION FOR REHEARING.

By the Court, HAWLEY, C. J.:

Respondents' counsel ask for a rehearing upon the following grounds:

First—"That the questions involved are of great public importance."

Second—That it might be well to further investigate the statute, "inasmuch as all opportunity of amending it has passed."

Third—"That they fear from a perusal of the opinion of the majority of the court, that by reason of their over-confidence in the impregnability of their position they failed to present, with clearness, their points of defense, and that, owing to the obscurity of their argument, the court failed to appreciate it, and that others may suffer through their neglect."

Fourth—"That no harm can come to any one by a rehearing."

These are the only points presented, and the only reasons given why a rehearing should be granted.

The facts alleged in the first, second and fourth grounds might induce us to grant a rehearing, if we had any doubt as to the correctness of our former opinion.

The third ground, if true, would, if a rehearing was granted upon it, establish a dangerous precedent, for it would always be easy for counsel to allege, after the case has been decided against them, that they were over-confident; that they thought their position was impregnable, and hence they failed to present their case with as much clearness as they otherwise would.

If counsel failed in their first efforts to present substantial reasons in favor of their conclusions, they ought, at least, to offer some new suggestions, as to the construction of the statute, worthy of further consideration, before they ask the court to allow a reargument.　New trials or rehearings should not be granted simply for the purpose of having a reargument, unless there is a reasonable probability that the court may have arrived at an erroneous conclusion, or overlooked some important question, which was necessary to be discussed in order to arrive at a full and proper understanding of the case.

But the statement of counsel, that they failed to present the case with clearness, is unjust to themselves.　They ably and intelligently presented every question which tended to sustain their conclusions.　They made their views absolutely clear. We were not misled by any obscurity of their arguments.

We were, and still are, unable to distinguish this case in principle from the Flanningham case.　(16 Nev. 92.)　If our conclusion in that case was right, and we still believe it was, then our decision in this case must be correct.　It is true that the same words may, and often do, have a different meaning in different statutes, but we are of opinion that the words "last general election" in these statutes have the same meaning.

If they are to be read with reference to the time when the statute was approved—without any reference to the future— then both decisions are erroneous, and ought to be set aside.

Take the Flanningham case.　The statute reads: "Every justice of the peace in any township in this state, wherein the number of legal votes cast at the last general election equals or exceeds the number of one thousand five hundred, shall receive as salary the sum of three thousand six hundred dollars per annum."

This statute was approved in March, 1879, and, as read at that time, the words "last general election" would refer to the general election of 1878.

So with the proviso in the first clause of the statute under consideration, "that in any county where, at the last general election, there were polled four thousand or more votes, such board shall consist of five members."

Now, the words "last general election," if the statute is to be read as of the date of its approval, in February, 1869, must necessarily refer to the election in 1868.

Following the strict letter of each of these statutes, as they would read at the time of their adoption, the result would be in Flanningham's case, that in any township wherein the number of legal votes cast at the election held in 1878 equaled or exceeded fifteen hundred, the justice of the peace should receive a salary without reference to the number of votes cast at the general election prior to the time when he assumed the duties of his office.

Yet this court, for reasons sufficiently stated in the opinion in that case, held that the words "last general election" refer to the last general election preceding the time when the claim of respondent for his salary was preferred. And for substantially the same reasons we decided that, under the provisions of the statute for the election of county commissioners, the test should not be the election in 1868; but that the words "last general election" refer to the election preceding the time when the commissioners take their office.

There is nothing in any other portion of this statute which gives to these words a different meaning.

Take the second proviso: "The counties which are, or shall be, under the provisions of this act, entitled to a board consisting of five county commissioners, two of the commissioners shall be elected to serve upon the board for the long term." This language refers to, and is governed by, the first proviso as to the number of county commissioners that are to be elected.

The third proviso upon which respondents seemed to rely with great confidence does not make any new classification, but refers, like the second, to the classification made in the first proviso. It reads: "In any county wherein at the last or any future general election there were or shall be polled for the first time four thousand or more votes, the board shall be increased to five members by appointment of the governor."

This clause was evidently inserted for the express purpose of immediately giving to Storey county five county commissioners, two to be appointed by the governor, it having at the

last general election, prior to the passage of the act, cast over four thousand votes, and the words "counties," "future elections" and "for the first time" were inserted so as to make the act general instead of special and provide for uniformity, and thus avoid the objections which might otherwise have been urged against its constitutionality.

It is apparent from every provision in the act, that the draftsman in drawing it, and the legislature in passing it, intended to classify the counties by a voting population at the general election, and to give to each county polling four thousand or more votes five commissioners, and all other counties three, for a period of two years, commencing on the first Monday in January after the general election.

We do not believe that the words "last general election" are to be read with sole reference to the time when the statute was adopted. If it was intended to be a continuous statute to provide not only for the present, but the future, then the words "last general election" should be read with reference to the time when the officer takes his office.

This is true of all statutes relating to classification based upon a voting population. A classification may be made by reference to the voting population at the last general election, and when so made it runs from one general election to the next; but it would be the *last* with reference to the time when the question is presented that should govern. Cities, as well as counties, might be thus classified. Cities having a voting population of ten thousand or more at the last election might be designated as cities of the first class; cities having a voting population of five thousand or more votes, and less than ten thousand, designated as cities of the second class, and all other cities having less than five thousand votes as cities of the third class, and each class be governed by different rules. Now if, in after years, the cities of the first class fell in population below the classification for that class, its form of government would necessarily change to the one provided for the class into which it would fall by reason of its decrease of population. Thus the city or cities which, at the time the law was passed, belonged to the first class, might, at the next general election, fall within the second or third class, and the cities

which, at the time the classification was made, belonged to the second or third class, might, at the next general election, come within the first class. These and kindred acts must, for obvious reasons, be construed with reference to the object which the legislature had in view at the time of their passage, so as to arrive at the intention of the legislature. "Such construction ought to be put upon a statute as may best answer the intention which the makers had in view. And this intention is sometimes to be collected from the cause or necessity of making the statute, and sometimes from other circumstances; and whenever such intention can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seem contrary to the letter of the statute. Where any words are obscure or doubtful, the intention of the legislature is to be resorted to in order to find the meaning of the words. A thing which is within 'the intention of the makers of the statute is as much within the statute as if it were within the letter; and a thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers." (*People* v. *Utica Ins. Co.*, 8 Am. Dec. 251.)

A statute should, if it reasonably can, be so construed as to avoid any conflict with the constitution.

It is evident from the various provisions of this act that the legislature, in adopting it, intended to provide for the future, as well as the present.

It was intended to make a general classification that would be uniform for all counties within this state.

Any county which at the last general election, prior to the passage of the act, "polled four thousand or more votes," should immediately be given five county commissioners; and, if "at the general election in A. D. 1870, and at such election held every two years thereafter," such county should poll four thousand or more votes, it should have five county commissioners, "to serve upon the board for the term of two years" from and after "the first Monday in January succeeding their election." And, if any other county "at the general election in A. D. 1870," or at any "future general election," should poll four thousand or more votes, it should have the same number

of county commissioners for the same period of two years.

Although the statute does not, in direct terms, make any provision for a reduction of the number of commissioners in cases where the counties once entitled to five should at "any future election" poll less than four thousand votes, yet such is its obvious meaning and effect. If the language is ambiguous or uncertain, the object and intent of the statute is clear. Counties having, at the last general election, polled four thousand or more votes are entitled to five county commissioners, and counties having, at the last general election polled less than four thousand votes are only entitled to three.

The words "last general election" are to be read as of the date when the question of the right of respondents to hold the office is presented. So read, it is not the vote cast in 1868, or in 1880, that controls, but the vote in 1882, when the last general election was held.

Legislation of this character is "intended not only to meet the wants of the present, but to provide for the future. It deals not with the past, but in theory, at least, anticipates the needs of a state, healthy with a vigorous development. It is intended to be permanent." (*Wheeler* v. *Philadelphia,* 77 Penn. St. 349.)

The act could not have been drawn for Storey county alone, independent of the number of votes that might be cast at any general election. A classification had to be made which would give to all counties coming within it an equal number of county commissioners. This could be done, although Storey was the only county that came within the classification at the time the act was passed.

This question is discussed in *Kilgore* v. *Magee,* 85 Penn. St., 411, with reference to the classification of cities. Among other things, the court said: "To say that no general law can be passed to regulate a certain subject because some of the classes contained in the regulation do not yet exist, or exist only in a limited number, is to hold that no law can be passed to provide for future wants or necessities. The welfare of the state and one of the chief purposes of legislation would be struck down by such a decision. * * * If the power to classify and regulate the subjects of cities generally be admit-

ted—and clearly it cannot be successfully denied—the question of local legislation is at an end; for though it may happen that but one city may fall within the class, *non constat* that others will not shortly do so, and therefore may be provided for. The law was not passed for Pittsburg as the only city happening within the second class, but for all cities having the population to bring them within that class."

A classification based upon population, to be constitutional, must give to other counties the rights and privileges of such classification by increase of population. (*Commonwealth* v. *Patton*, 88 Penn. St. 260; see, also, *Van Riper* v. *Parsons*, 40 N. J. L. 6; *State* v. *Con. Vir. M. Co.*, 16 Nev. 441, *et seq.*)

The counties coming within the class may be but one; but the law must "operate equally and uniformly upon all brought within the relations and circumstances for which it provides." (*People* v. *Cooper*, 83 Ill. 589; *Youngs* v. *Hall*, 9 Nev. 212.)

Now, it may be said that giving to this act the construction contended for by respondents, viz.: that the number of votes cast at the general election in 1880 should determine the number of county commissioners that Storey county is entitled to elect in 1882, would operate uniformly upon all counties similarly situated. In one sense this would be true; but let us pause for a moment to consider the practical working and effect of this law if it should be so construed by the courts.

The classification is made for two years, and is based upon a voting population at the general election. Now, Storey county, having cast four thousand votes in 1880, would be entitled to five commissioners in 1882, although its voting population at that time (1882) was less than four thousand. Say that Washoe and Eureka, at the the election in 1882, had cast over four thousand votes, then they would be entitled to five commissioners; not because they polled four thousand votes in 1880, but because they, "for the first time," came within the classification at the election in 1882. In 1884 Washoe and Eureka would be entitled to elect five commissioners, because in 1882 they cast over four thousand votes, although at the election in 1884 less than four thousand votes might be cast. Storey county in 1884, however, could only have three commissioners, because in 1882 it cast less than

four thousand votes, although its voting population in 1884 might be more than four thousand votes, because it would not be "the first time" this county had cast that number.

Can such a construction of the law be said to operate, in its practical working and effect, with uniformity? We think not.

We do not believe that the words "last general election" mean two years before the last general election. We think the words must be read as of 1883, not of 1869, when the statute was passed. The last general election was held in 1882, and the vote cast at that election determines the number of county commissioners that Storey county is entitled to for a period of two years after the first Monday in January, 1883. It is a continuous statute. The words relate to the present and the future. In so construing this statute we make no departure from the established decisions of the courts.

In 1800 the legislature of Kentucky passed a law "that any alien * * * who shall have actually resided within this commonwealth two years" shall be entitled to hold real estate. Several years thereafter, and while the statute continued in force, a question was raised whether Allen Campbell, an alien who came to the state in 1799, and resided therein until 1804, came within the provisions of the act. At the time of the approval of the law, in 1800, he had not resided in the state two years, and it was contended that, by the language of the statute, a residence of two years, prior to its passage, was indispensable to claim a right under it, and so it would be if the right was claimed at the time the law was approved. The court held that the words "shall have actually resided" refer as well to the future as the past.

"We are clearly of the opinion that the law gives the right to aliens, on two years' residence subsequent to the law as well as prior to it." (*Beard* v. *Rowan*, 1 McLean 141.) The words "shall have actually resided" were to be read as of the time when the right of the alien to hold real estate is asserted.

We have carefully read the statute under consideration. We take its language and construe it with reference to the object which the legislature had in view at the time of its enactment. We consider the object and spirit of the act, and

allow these to control the strict letter where it is ambiguous.

" If the legislature intended to adopt a general system which, when put in practical operation, would come nearest giving five county commissioners to counties having four thousand or more voters, and to others three," it is not reasonable to presume that it would, in a state where the population is as migratory and uncertain as this, have made the test two years away.

It would, it seems to us, come nearest giving five county commissioners to counties polling four thousand or more votes to count the votes polled at the election when the commissioners are elected, and this is what the legislature intended should be done; and but for the bungling manner in which the statute was drawn, no pretext could be found for deciding otherwise.

We have drawn our construction of the statute from every legitimate source, and have given to its language the broadest significance, because we believed that by so doing we could carry out the real purpose which the legislature intended at the time of its adoption.

We did not stop to consider the effect of our construction upon any political party, or upon any particular person or persons. Courts " must be governed by the principle of law, and not by the hardship of any particular case." The people have the right to expect this judicial independence. That very independence which, adhering strictly to principle, conflicts with the real or fancied interests of to-day, may be their only shield from destruction to-morrow.

Whoever looks thus to expediency only, in legal questions, must often find himself in opposition to the courts.

Rehearing denied.

LEONARD, J., dissenting:

I dissent.